THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ERIC EPPINGER *et al.*, Defendants-Appellants.

Third District   Nos. 3—96—0515, 3—96—0671 cons.

Opinion filed December 4, 1997.—Rehearing denied January 12, 1998.

HOLDRIDGE, J., specially concurring.
HOMER, J., dissenting.

Barbara O'Brien, of State Appellate Defender's Office, of Ottawa, for appellants.

Kevin W. Lyons, State's Attorney, of Peoria (John X. Breslin and Domenica Osterberger, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McCUSKEY delivered the opinion of the court:
Following a joint jury trial, the defendants, Eric Eppinger and

Jordan Landis Watkins, were each convicted of aggravated battery with a firearm and aggravated discharge of a firearm. 720 ILCS 5/12—4.2(a)(1), 24—1.2(a)(1) (West 1994). Both defendants were sentenced to eight-year terms of imprisonment. In this consolidated appeal, the defendants contend: (1) the State's identification evidence was insufficient to prove them guilty beyond a reasonable doubt; and (2) they were prejudiced by the trial judge's communication with the jury. After carefully reviewing the record, we affirm.

## FACTS

At trial, 19-year-old Wesley Zolicoffer testified that on June 23, 1995, he lived at 927 Greenlawn, Peoria, Illinois, with his grandparents. Around 11:20 p.m., he was sitting in the enclosed front porch smoking when he observed two young men approach the house from a gangway across the street. Wesley observed the men by the light from a street lamp two houses away and noted that the men carried guns. When they reached the curb in front of the house, they raised their guns and fired a rapid succession of bullets at the house. Wesley ran indoors, where he found his grandfather, James Zolicoffer, bleeding from gunshot wounds to his arm and hip. Wesley telephoned the police.

Wesley told the police that one of the shooters, whom he recognized as "Jordan," wore a Blue Devils baseball cap. Wesley identified a photograph of Jordan Watkins as this shooter. Wesley told the police the other shooter wore a hooded sweatshirt and testified that he recognized this individual as "Eric" by his hair, build and gait. At some point, Wesley also told the police that he could recognize Eric because his eyes were green. At trial, he explained the defendants had walked by the house several times during the day of the incident, and he saw Eric carrying a gun. Wesley thought he also saw Eric in the neighborhood a month or so earlier. However, he admitted that he did not know Eric's name until Wesley's cousin, who was visiting the Zolicoffers, told him on the day of the incident. On cross-examination, Wesley said the shooter he identified as Eric was taller than Jordan. He also testified that he went inside the house before the shooters left the scene.

Officer Jeffrey Kice testified that Wesley was highly agitated when he was interviewed on the night of the shooting. According to Kice, Wesley said that Jordan was the taller of the two shooters. Kice also said that Wesley told him he saw the two men run back across the street following the shooting.

Susan Cagle, a neighbor of the Zolicoffers, testified that the only streetlight on the block had been shot out and not replaced prior to

June 23, 1995. Further, the parties stipulated that Detective Drew Helms would testify that Wesley did not give the police Eric's name or tell them that Eric had green eyes until more than a month after the incident.

Wesley's 15-year-old brother, Talya, testified at trial that he saw Jordan and Eric in the neighborhood with a group of young men earlier in the day. Talya heard someone in the group tell Eric to "pop" him. Talya did not witness the shooting, but he said he told the police Jordan's and Eric's names on the night of the shooting based on Wesley's identification. Talya said that he had never seen Eric before the day of the shooting.

Nattie Eppinger, Eric's mother, testified that Eric was in juvenile detention in Champaign, Illinois, for six months until June 22, 1995. She said that he and several friends, including Jordan, were in and out of her home all day on June 23. She said that she saw Eric on a bed in his sister's room when she checked the room at 11 p.m. and midnight. Nattie admitted that she did not know what time Jordan left the house.

At 11:30 a.m. on the second day of trial, the jury received instructions and began its deliberations. At 8:05 p.m., the jury returned to the courtroom and informed the trial judge that it could not reach a verdict. The following dialogue ensued:

"THE COURT: Two things I would wish to point out. One is I don't want to know what the vote is or which way it is, you understand, but I want to also know—you realize there are two cases here. *** As to the case of Mr. Eppinger, what is the vote in that case or have you thought of it that way?

THE FOREPERSON: Vote was 11 jurors convict.

THE COURT: And Mr. Watson?

THE FOREPERSON: 11 convict.

THE COURT: So both votes are the same. All right. I am going to give you *** an instruction *** and ask you to go back and continue to deliberate for a short time. I'm thinking maybe a half an hour and see if that moves anything. If it doesn't, then I'll call you back in."

The court then gave the deadlocked jury instruction pursuant to *People v. Prim*, 53 Ill. 2d 62, 289 N.E.2d 601 (1972), and the jury resumed its deliberations at 8:12 p.m. At 9 p.m., the jury returned verdicts finding both defendants guilty of the charged offenses. The defendants were subsequently sentenced to terms of eight years' imprisonment in the Illinois Department of Corrections. The defendants have filed a timely notice of appeal from their convictions.

## I. Proof Beyond a Reasonable Doubt

The defendants first argue that they were not proven guilty beyond a reasonable doubt. They claim that Wesley Zolicoffer's identification was doubtful and insufficient to support their convictions.

■ It is well settled that the positive identification of a defendant by a single witness, even if contradicted, may be sufficient to sustain a conviction. *People v. Smith*, 278 Ill. App. 3d 343, 356, 662 N.E.2d 480, 489 (1996). Where positive identification testimony conflicts with alibi evidence, it is the duty of the trier of fact to determine the truth. *People v. Bryant*, 123 Ill. App. 3d 266, 272, 462 N.E.2d 780, 784 (1984). Reliability of an identification is tested by the totality of circumstances, including the witness' opportunity to view the perpetrator, the witness' degree of attention, the certainty and accuracy of the description, and the time elapsing between the crime and the identification. *People v. Manion*, 67 Ill. 2d 564, 571, 367 N.E.2d 1313, 1317 (1977).

■ On review, this court will review the evidence in the light most favorable to the State and will not substitute its judgment for that of the trier of fact in matters of weight, credibility or conflicting evidence. *People v. Morales*, 281 Ill. App. 3d 695, 704, 666 N.E.2d 839, 845 (1996). A court of review will not reverse a conviction unless the evidence is so improbable as to raise a reasonable doubt concerning the defendant's guilt. *People v. Collins*, 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277 (1985).

■ After applying the *Collins* standard, we find the State's evidence sufficient to support the defendants' convictions. Wesley Zolicoffer's testimony identified the defendants as the shooters. We note that his identification was by no means free of inconsistencies. However, the jury was in a superior position to evaluate and weigh his testimony, which was corroborated in some respects by his brother, Talya. From this evidence, a rational jury could have believed Wesley's testimony. Moreover, a rational jury could have found the discrepancies between the initial police reports and Wesley's in-court testimony were adequately explained by his state of agitation and excitement immediately following the shooting. Other factual discrepancies, including testimony regarding the lighting in the street and the partial alibi evidence, were also matters of credibility to be weighed and resolved by the trier of fact as well. Following our review of the record, we find the defendants were proved guilty beyond a reasonable doubt.

## II. The Judge's Communication With the Jury

The defendants also claim that the trial judge's communication

with the jury constituted reversible error. Specifically, they argue that the judge coerced the verdict when he gave the *Prim* instruction after learning the numerical division of the jury was 11 to 1 in favor of conviction.

■ We initially note that the defendants failed at trial to make a timely objection when the judge gave the *Prim* instruction. They also failed to make a motion for a mistrial after the instruction was given and further failed to raise the issue in their posttrial motions. Generally, an error is waived where the defendant fails to object at trial and in his posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 187, 522 N.E.2d 1124, 1130 (1988). However, where the defendant fails to object, the plain error rule applies when the evidence is closely balanced or the alleged defect may have substantially affected the defendant's right to a fair trial. *People v. Rush*, 238 Ill. App. 3d 806, 812, 606 N.E.2d 132, 137 (1992). Consequently, despite the defendants' waiver in this case, we will apply the plain error rule because the defendants' claim alleges that the verdict was coerced and thus brings into question the defendants' constitutional right to a fair trial.

■ In Illinois, it is improper for the trial court to inquire into the numerical division of the jury. *People v. Santiago*, 108 Ill. App. 3d 787, 805, 439 N.E.2d 984, 996 (1982), citing *People v. Duszkewycz*, 27 Ill. 2d 257, 189 N.E.2d 299 (1963); *People v. Golub*, 333 Ill. 554, 165 N.E. 196 (1929). However, when the trial court learns of the numerical division of votes favoring conviction and acquittal, such a communication is not *per se* error. See *Santiago*, 108 Ill. App. 3d at 806, 439 N.E.2d at 996-97 (distinguishing Illinois law from the United States Supreme Court case, *Brasfield v. United States*, 272 U.S. 448, 71 L. Ed. 345, 47 S. Ct. 135 (1926), which held that an inquiry into the numerical division of a jury was *per se* error in the federal courts). Rather, whether the trial court's error was prejudicial or harmless depends upon the surrounding circumstances and particular facts of the case. *Golub*, 333 Ill. at 561, 165 N.E. at 199; *Santiago*, 108 Ill. App. 3d at 806, 439 N.E.2d at 997.

We find the surrounding circumstances in the instant case do not constitute plain error. Although the judge did inquire into the numerical division of the jury, the foreman of the jury volunteered the fact that the majority favored conviction. The judge then, without objection from the defendants, gave the *Prim* instruction. Although the language of the *Prim* instruction does encourage jurors to reevaluate their positions, it does not necessarily imply that any one juror should change his or her opinion. Indeed, "[a] judge's instruction[ ] to continue deliberations after an unsolicited disclosure does not imply approval, disapproval or anything else, nor does it suggest

that minority jurors change their stance." *People v. Farella*, 79 Ill. App. 3d 440, 445-46, 398 N.E.2d 615, 619 (1979) (finding that a judge's instruction to continue deliberating was not plain error even though the judge knew the numerical division of the jury and how many jurors favored conviction). Furthermore, the jury deliberated more than 45 minutes after reviewing the *Prim* instruction. This amount of time was sufficient for the jurors to reevaluate their positions without being influenced by the judge's comments. See *People v. Hanks*, 210 Ill. App. 3d 817, 823, 569 N.E.2d 205, 208 (1991) (holding that the trial judge's reference to sequestration did not improperly influence the verdict given the 45 minutes they deliberated after the comment was made); *People v. Thomas*, 185 Ill. App. 3d 1050, 1057-58, 542 N.E.2d 100, 105 (1989) (holding that 35 minutes is sufficient for jurors to reevaluate their positions).

Although the defendants argue that *Santiago* requires reversal, we find that case to be distinguishable. In *Santiago*, the trial judge inquired into the numerical division of the jury. The foreman of the jury not only gave the numerical division, but also said how the division was broken down. The judge then gave the *Prim* instruction. The defendant responded by making a motion for a mistrial. The trial judge denied the motion. See *Santiago*, 108 Ill. App. 3d at 804, 439 N.E.2d at 995-96. During the next day of deliberations, the judge inquired a second time into the numerical division of the jury. After having learned the numerical breakdown was 11 to 1, the judge called the jury into court three more times and repeatedly questioned the foreman regarding the state of deliberations. Finally, on the morning of the third day of deliberations, the jury returned a verdict. *Santiago*, 108 Ill. App. 3d at 807, 439 N.E.2d at 997.

On appeal, the defendant in *Santiago* argued that the trial judge coerced the minority into returning a verdict of guilty by: (1) repeatedly calling the jury into open court; (2) asking the numerical division of the jury; and (3) ordering the jury to continue deliberations after the judge became aware that the majority of the jurors was in favor of a verdict of guilty and after the foreman indicated that he did not know whether further deliberations would help. The appellate court found that all these factors, *"taken together,"* indicated that the verdict was reached by "improper prodding" from the trial judge. (Emphasis added.) *Santiago*, 108 Ill. App. 3d at 807, 439 N.E.2d at 997-98.

The facts in *Santiago* indicate that the trial judge's knowledge of the numerical division of the jury combined with his *Prim* instruction did not constitute "improper prodding" alone. Rather, the judge's repeated attempts over three days to coerce the jury into reaching a

verdict *combined* with his knowledge of the numerical division is what constituted the improper coercion. Certainly, *Santiago* indicates that the surrounding circumstances must be considered very carefully when the trial judge instructs a jury to continue deliberating after learning the numerical division of the jury. However, we find that *Santiago* does not support a conclusion that these factors standing *alone* always constitute plain error.[1]

In sum, we find no circumstances in the record surrounding the trial judge's actions in this case indicating that the jury was coerced by the court's comments. As a result, we find the judge's instruction to the jury did not constitute plain error. See *Farella*, 79 Ill. App. 3d at 446, 398 N.E.2d at 619 (stating that "we simply see no prejudice resulting from an unsolicited statement by the jury followed by an extraordinarily neutral response and we will not reverse on that basis").

## CONCLUSION

For the reasons indicated, we find the defendants were proven guilty beyond a reasonable doubt, and the communication between the trial judge and the jury did not coerce a verdict. Accordingly, the judgments of the circuit court of Peoria County are affirmed.

Affirmed.

JUSTICE HOLDRIDGE, specially concurring:

I concur with the majority's decision to affirm the defendants' convictions. I write separately, however, because I believe that the majority's reading of the holding in *People v. Santiago*, 108 Ill. App. 3d 787, 806 (1982), is too expansive when it infers from *Santiago* that the court's knowledge of the numerical division of the jury combined with the *Prim* instruction, standing *alone*, could never constitute harmless error.

Here, as in *Santiago*, where the issue is reviewed under the plain error doctrine, the question that must be answered is whether the defendant has proven prejudice. Whether prejudice has been proven

---

[1] We are mindful of the footnotes in *Santiago* which suggest that it is coercive for a trial judge to instruct the jury to continue deliberations after learning the numerical division of the jury. *Santiago*, 108 Ill. App. 3d at 807 nn. 3-4, 439 N.E.2d at 998 nn. 3-4. However, the quotes in these footnotes are from foreign jurisdictions. More importantly, the express finding in *Santiago* is that *all* the surrounding circumstances, "*taken together*," constituted coercion. (Emphasis added.) *Santiago*, 108 Ill. App. 3d at 807, 439 N.E.2d at 997-98.

depends upon the surrounding circumstances and particular facts of *each* case. *Santiago*, 108 Ill. App. 3d at 806. It would be possible, therefore, for a situation to arise where the court's knowledge of the numerical division of the jury, combined with the *Prim* instruction, *would constitute* reversible error under a plain error analysis. If the defendant could show from the record that he was prejudiced in such a situation, even without any other actions or statements by the trial court, I believe plain error would be shown, and the defendant would be entitled to a new trial.

I agree that the defendants in this matter have failed to show any prejudice from the trial court's actions, and I therefore concur with the decision to affirm the trial court.

JUSTICE HOMER, dissenting:

I believe that the trial court's inquiry into the numerical division of the jury and subsequent communication improperly interfered with the jury deliberation process to the prejudice of the defendants. Accordingly, I respectfully dissent from the majority's holding that the communication amounted to harmless error.

Plain error arises when the evidence is closely balanced or when the error is so fundamental that it denied the defendant a fair trial. *People v. Bounds*, 171 Ill. 2d 1, 662 N.E.2d 1168 (1995). A trial judge's inquiry into the numerical division of a jury is improper. *People v. Duszkewycz*, 27 Ill. 2d 257, 189 N.E.2d 299 (1963). Such inquiry may be deemed plain error if it interferes with the jury's deliberation to the prejudice of the defendant or coerces a verdict. See *People v. Fields*, 285 Ill. App. 3d 1020, 675 N.E.2d 180 (1996); see also *People v. Santiago*, 108 Ill. App. 3d 787, 805, 439 N.E.2d 984 (1982), citing *People v. Golub*, 333 Ill. 554, 165 N.E. 196 (1929); *People v. Heidorn*, 114 Ill. App. 3d 933, 449 N.E.2d 568 (1983).

In this case, I believe that the court's communication with the jury denied the defendants a fair trial. By the court's preface to its question to the jury foreman, it appears that the court intended to ascertain the bare numerical split rather than which verdict each side favored. However, the judge's question to the foreman with regard to Eppinger was poorly phrased and invited precisely the kind of information that the court sought to avoid. Then, when the foreman disclosed that 11 jurors favored Eppinger's conviction, the judge failed to qualify his earlier remarks or rephrase the question with regard to Watkins. Under the circumstances, the jurors could have reasonably concluded that the court *did* want to know what verdicts were favored. The judge's succeeding comments prodding the jury toward unanimity and the giving of the *Prim* instruction created the

impression that the court agreed with the 11 jurors favoring guilty verdicts. See *Santiago*, 108 Ill. App. 3d at 807, 439 N.E.2d at 997. Within a short time after the jury resumed deliberations, the holdout juror relented and guilty verdicts were rendered.

The majority cites *People v. Farella*, 79 Ill. App. 3d 440, 398 N.E.2d 615 (1979), as support for its conclusion that the court's communication amounted to only harmless error. *Farella*, however, is factually dissimilar to the instant case. In *Farella*, the jury sent an *unsolicited* note to the judge indicating that the jury was deadlocked with three jurors favoring a guilty verdict on one count and seven jurors favoring a guilty verdict on a second count. After informing the parties of the jury's communication, the judge responded in writing, "[c]ontinue deliberating." In the instant case, the improper information was elicited by the judge in open court and his subsequent directives were far more explicit. Moreover, the potential for such an interchange to prejudice a defendant increases with the number of jurors favoring the majority position on a particular verdict. In the instant case, unlike in *Farella*, there was but a single holdout at the time of the improper inquiry and communication.

The other cases cited by the majority also do not support its conclusion. Neither *People v. Hanks*, 210 Ill. App. 3d 817, 569 N.E.2d 205 (1991), nor *People v. Thomas*, 185 Ill. App. 3d 1050, 542 N.E.2d 100 (1989), involved jury disclosure of numerical division or verdict preference.

Based on my review of relevant authority and the record in this case, I would reverse the defendants' convictions and order a new trial.